COPY

1  EILEEN M. DECKER
   United States Attorney
2  LAWRENCE S. MIDDLETON
   Assistant United States Attorney
3  Chief, Criminal Division
   DENNISE D. WILLETT
4  Assistant United States Attorney
   Chief, Santa Ana Branch Office
5  JOSHUA M. ROBBINS (Cal. Bar No. 270553)
   SCOTT D. TENLEY (Cal. Bar No. 298911)
6  Assistant United States Attorneys
   ASHWIN JANAKIRAM (Cal. Bar No. 277513)
7  Special Assistant United States Attorney
        8000 United States Courthouse
8       411 West Fourth Street
        Santa Ana, California 92701
9       Telephone:  (714) 338-3538
        Facsimile:  (714) 338-3708
10      E-mail:    joshua.robbins@usdoj.gov

11 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

12

                   UNITED STATES DISTRICT COURT
13
            FOR THE CENTRAL DISTRICT OF CALIFORNIA
14
                       SOUTHERN DIVISION
15
   UNITED STATES OF AMERICA,        No. SACR15-00148
16
              Plaintiff,
17                                   PLEA AGREEMENT FOR DEFENDANT
              v.                     PHILIP A. SOBOL
18
   PHILIP A. SOBOL,
19
              Defendant.
20

21      1.   This constitutes the plea agreement between PHILIP A. SOBOL

22 ("defendant") and the United States Attorney's Office for the Central

23 District of California ("the USAO") in the above-captioned case.

24 This agreement is limited to the USAO and cannot bind any other

25 federal, state, local, or foreign prosecuting, enforcement,

26 administrative, or regulatory authorities.

27 //

28 //

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a two-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy, in violation of 18 U.S.C. § 371, and Interstate Travel in Aid of a Racketeering Enterprise, in violation of 18 U.S.C. § 1952.

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g.   Pay the applicable special assessments at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

3.   Defendant further agrees to make payment of half of the agreed-upon forfeited amounts and/or restitution (totaling $5.2 million – one half equaling $2.6 million) no later than 180 days of

2

1 the entry of his guilty plea, and the remainder no later than 30 days
2 before his sentencing.

3     4.   Defendant further agrees to cooperate fully with the USAO,
4 the Federal Bureau of Investigation, the United States Postal
5 Inspection Service - Office of the Inspector General, the Internal
6 Revenue Service, and, as directed by the USAO, any other federal,
7 state, local, or foreign prosecuting, enforcement, administrative, or
8 regulatory authority. This cooperation requires defendant to:

9       a.   Respond truthfully and completely to all questions
10 that may be put to defendant, whether in interviews, before a grand
11 jury, or at any trial or other court proceeding.

12       b.   Attend all meetings, grand jury sessions, trials or
13 other proceedings at which defendant's presence is requested by the
14 USAO or compelled by subpoena or court order.

15       c.   Produce voluntarily all documents, records, or other
16 tangible evidence relating to matters about which the USAO, or its
17 designee, inquires.

18     5.   For purposes of this agreement: (1) "Cooperation
19 Information" shall mean any statements made, or documents, records,
20 tangible evidence, or other information provided, by defendant
21 pursuant to defendant's cooperation under this agreement; and
22 (2) "Plea Information" shall mean any statements made by defendant,
23 under oath, at the guilty plea hearing and the agreed to factual
24 basis statement in this agreement.

25 //
26 //
27 //
28

THE USAO'S OBLIGATIONS

6.   The USAO agrees to:

   a.   Not contest facts agreed to in this agreement.

   b.   Abide by all agreements regarding sentencing contained in this agreement.

   c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

   d.   Recommend that defendant be sentenced to a term of imprisonment and a fine no higher than the low end of the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 25 or higher and provided that the Court does not depart downward in offense level or criminal history category.   For purposes of this agreement, the low end of the Sentencing Guidelines range is that defined by the Sentencing Table in U.S.S.G. Chapter 5, Part A.

7.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not to further criminally prosecute defendant for violations arising out of defendant's conduct described in the agreed-to factual basis set forth in paragraph 21 below.   Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.   Defendant agrees that at the time of sentencing the Court may consider the uncharged conduct in determining the applicable

4

1  Sentencing Guidelines range, the propriety and extent of any

2  departure from that range, and the sentence to be imposed after

3  consideration of the Sentencing Guidelines and all other relevant

4  factors under 18 U.S.C. § 3553(a).

5     8.   The USAO further agrees:

6        a.   Not to offer as evidence in its case-in-chief in the

7  above-captioned case or any other criminal prosecution that may be

8  brought against defendant by the USAO, or in connection with any

9  sentencing proceeding in any criminal case that may be brought

10  against defendant by the USAO, any Cooperation Information.

11  Defendant agrees, however, that the USAO may use both Cooperation

12  Information and Plea Information: (1) to obtain and pursue leads to

13  other evidence, which evidence may be used for any purpose, including

14  any criminal prosecution of defendant; (2) to cross-examine defendant

15  should defendant testify, or to rebut any evidence offered, or

16  argument or representation made, by defendant, defendant's counsel,

17  or a witness called by defendant in any trial, sentencing hearing, or

18  other court proceeding; and (3) in any criminal prosecution of

19  defendant for false statement, obstruction of justice, or perjury.

20        b.   Not to use Cooperation Information against defendant

21  at sentencing for the purpose of determining the applicable guideline

22  range, including the appropriateness of an upward departure, or the

23  sentence to be imposed, and to recommend to the Court that

24  Cooperation Information not be used in determining the applicable

25  guideline range or the sentence to be imposed.  Defendant

26  understands, however, that Cooperation Information will be disclosed

27  to the probation office and the Court, and that the Court may use

28

5

1  Cooperation Information for the purposes set forth in U.S.S.G

2  § 1B1.8(b) and for determining the sentence to be imposed.

3             c.   In connection with defendant's sentencing, to bring to

4  the Court's attention the nature and extent of defendant's

5  cooperation.

6             d.   If the USAO determines, in its exclusive judgment,

7  that defendant has both complied with defendant's obligations under

8  paragraphs 2 and 3 above and provided substantial assistance to law

9  enforcement in the prosecution or investigation of another

10 ("substantial assistance"), to move the Court pursuant to U.S.S.G.

11 § 5K1.1 to fix an offense level and corresponding guideline range

12 below that otherwise dictated by the sentencing guidelines, and to

13 recommend a term of imprisonment at the low end of this reduced

14 range.

15             DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

16     9.   Defendant understands the following:

17            a.   Any knowingly false or misleading statement by

18 defendant will subject defendant to prosecution for false statement,

19 obstruction of justice, and perjury and will constitute a breach by

20 defendant of this agreement.

21            b.   Nothing in this agreement requires the USAO or any

22 other prosecuting, enforcement, administrative, or regulatory

23 authority to accept any cooperation or assistance that defendant may

24 offer, or to use it in any particular way.

25            c.   Defendant cannot withdraw defendant's guilty pleas if

26 the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a

27 reduced guideline range or if the USAO makes such a motion and the

28

1  Court does not grant it or if the Court grants such a USAO motion but
2  elects to sentence above the reduced range.

3          d.    At this time the USAO makes no agreement or
4  representation as to whether any cooperation that defendant has
5  provided or intends to provide constitutes or will constitute
6  substantial assistance.   The decision whether defendant has provided
7  substantial assistance will rest solely within the exclusive judgment
8  of the USAO.

9          e.    The USAO's determination whether defendant has
10  provided substantial assistance will not depend in any way on whether
11  the government prevails at any trial or court hearing in which
12  defendant testifies or in which the government otherwise presents
13  information resulting from defendant's cooperation.

14                       <u>NATURE OF THE OFFENSES</u>

15      10.   Defendant understands that for defendant to be guilty of
16  the crime charged in count one, that is, Conspiracy, in violation of
17  Title 18, United States Code, Section 371, the following must be
18  true:  (1) Beginning in or around 2005, and continuing to in or
19  around April 2013, there was an agreement between two or more persons
20  to commit Mail Fraud and Honest Services Mail Fraud, in violation of
21  Title 18, United States Code, Sections 1341 and 1346 and Interstate
22  Travel in Aid of a Racketeering Enterprise, in violation of Title 18,
23  United States Code, Section 1952(a)(3); (2) defendant became a member
24  of the conspiracy knowing of at least one of its objects and
25  intending to help accomplish it; and (3) one of the members of the
26  conspiracy performed at least one overt act for the purpose of
27  carrying out the conspiracy.
28

11. Defendant understands that Mail Fraud, in violation of Title 18, United States Code, Section 1341, has the following elements: (1) the defendant knowingly devised or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) the statements made or facts omitted as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud; and (4) the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

12. Defendant further understands that Honest Services Mail Fraud, in violation of Title 18, United States Code, Section 1346, has the following elements: (1) the defendant devised or participated in a scheme or plan to deprive a patient of his or her right to honest services; (2) the scheme or plan consisted of a bribe or kickback in exchange for medical services; (3) a medical professional person owed a fiduciary duty to the patient; (4) the defendant acted with the intent to defraud by depriving the patient of his or her right of honest services; (5) the defendant's act was material, that is, it had a natural tendency to influence, or was capable of influencing, a person's acts; and (6) the defendant used, or caused someone to use, the mails to carry out or attempt to carry out the scheme or plan.

13. Defendant further understands that Interstate Travel in Aid of a Racketeering Enterprise, in violation of Title 18, United States Code, Section 1952(a)(3), has the following elements: (1) defendant used the mail or a facility of interstate commerce with the intent to

promote, manage, establish, or carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, specifically payment and receipt of kickbacks in violation of California Business & Professions Code § 650, California Insurance Code § 750, and California Labor Code § 3215; and (2) after doing so, defendant performed or attempted to perform an act to promote, manage, establish, or carry on, or facilitate the promotion, management, establishment, or carrying on, of such unlawful activity.

## PENALTIES AND RESTITUTION

14. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

15. Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1952(a)(3), is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

16. Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 10 years imprisonment; a 3-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $200.

17.    Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

18.    Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition.  Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

19.    Defendant understands that, if defendant is not a United States citizen, the felony convictions in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future.  The court cannot, and defendant's attorney also may not be able to, advise defendant

1  fully regarding the immigration consequences of the felony conviction

2  in this case.   Defendant understands that unexpected immigration

3  consequences will not serve as grounds to withdraw defendant's guilty

4  plea.

5      20.   Defendant understands that defendant will be required to

6  pay full restitution to the victims of the offenses to which

7  defendant is pleading guilty.   Defendant agrees that, in return for

8  the USAO's compliance with its obligations under this agreement, the

9  Court may order restitution to persons other than the victims of the

10 offenses to which defendant is pleading guilty and in amounts greater

11 than those alleged in the counts to which defendant is pleading

12 guilty.   In particular, defendant agrees that the Court may order

13 restitution to any victim of any of the following for any losses

14 suffered by that victim as a result:   (a) any relevant conduct, as

15 defined in U.S.S.G. § 1B1.3, in connection with the offenses to which

16 defendant is pleading guilty; and (b) any charges not prosecuted

17 pursuant to this agreement as well as all relevant conduct, as

18 defined in U.S.S.G. § 1B1.3, in connection with those counts and

19 charges.   The parties agree that the amount of restitution due is

20 $5.2 million.   The parties agree that any amount forfeited under this

21 agreement and/or paid to victims in order to resolve civil claims

22 arising from the conduct described in paragraph 21 below shall be

23 credited towards defendant's payment of restitution, and that any

24 amount paid as restitution shall be credited towards his forfeiture.

25                          FACTUAL BASIS

26     21.   Defendant admits that defendant is, in fact, guilty of the

27 offenses to which defendant is agreeing to plead guilty.   Defendant

28 and the USAO agree to the statement of facts provided below and agree

                                11

1  that this statement of facts is sufficient to support pleas of guilty
2  to the charges described in this agreement and to establish the
3  Sentencing Guidelines factors set forth in paragraph 23 below but is
4  not meant to be a complete recitation of all facts relevant to the
5  underlying criminal conduct or all facts known to either party that
6  relate to that conduct.

7      Pacific Hospital of Long Beach ("Pacific Hospital") was a
8  hospital located in Long Beach, California, specializing in
9  surgeries, particularly spinal and orthopedic surgeries.  From at
10  least in or around 1997 to October 2013, Pacific Hospital was owned
11  and/or operated by Michael D. Drobot.  Drobot also owned and/or
12  operated Pacific Specialty Physician Management, Inc. ("PSPM"), a
13  physician practice management company, and two companies that managed
14  in-house pharmaceutical dispensary programs on behalf of physicians:
15  California Pharmacy Management LLC ("CPM") and Industrial Pharmacy
16  Management LLC ("IPM") (collectively, the "Dispensary Management
17  Companies").  Beginning in or around 2003, Executive A operated CPM
18  under the direction of Drobot, with CPM ceasing operations around
19  2007.  From 2007 to 2010, Drobot and Executive A together owned, and
20  Executive A operated, IPM.  From 2010 to at least November 2013,
21  Executive A exclusively owned and operated IPM.

22      Beginning in or around 2005 and continuing to in or around April
23  2013, in Orange and Los Angeles Counties, within the Central District
24  of California, and elsewhere, defendant, Drobot, and Executive A,
25  together with other co-conspirators known and unknown to the United
26  States Attorney, knowingly combined, conspired, and agreed to commit
27  the following offenses against the United States:  Mail Fraud and
28  Honest Services Mail Fraud, in violation of Title 18, United States

1   Code, Sections 1341 and 1346; and Interstate Travel in Aid of a

2   Racketeering Enterprise, in violation of Title 18, United States

3   Code, Section 1952(a)(3).

4        Specifically, beginning no later than 2005 and continuing

5   through in or around April 2013, defendant conspired with Drobot,

6   Executive A, and others working for Pacific Hospital, the Dispensary

7   Management Companies, PSPM, and related companies, to exchange

8   monetary kickbacks in return for the referral of patients to Pacific

9   Hospital for surgical services paid for primarily through the

10  California Workers' Compensation System ("CWCS").  In paying the

11  kickbacks and submitting the resulting claims for the surgical

12  services, the conspirators acted with the intent to defraud workers'

13  compensation insurance carriers and to deprive the patients of their

14  right of honest services.

15       As defendant knew, the hospital kickback scheme operated as

16  follows:  Drobot and other co-conspirators offered to pay kickbacks

17  to doctors and chiropractors (the "kickback recipients") in return

18  for their referring workers' compensation patients to Pacific

19  Hospital for spinal surgeries, other types of surgeries, magnetic

20  resonance imaging, toxicology, durable medical equipment, and other

21  services which would be paid through the CWCS.  Influenced by the

22  promise of kickbacks, the kickback recipients referred patients

23  insured through the CWCS to Pacific Hospital for spinal surgeries,

24  other types of surgeries, and other medical services.  The workers'

25  compensation patients were not informed that the medical

26  professionals had been offered kickbacks to induce them to refer the

27  surgeries to Pacific Hospital.

28

13

1    Defendant knew that it was illegal to pay or receive kickbacks
2  for the referral of patients for surgical services.  Defendant's
3  receipt of such illegal kickbacks was material to the insurance
4  carriers who paid for the surgical services; it was also material to
5  the patients, to whom defendant owed a fiduciary duty to disclose any
6  financial conflicts of interest.  However, as defendant knew, his co-
7  conspirators deliberately did not disclose to the insurance carriers
8  the kickback payments, and defendant did not disclose those payments
9  to his patients.

10    Defendant, an orthopedic surgeon, owned Sobol Orthopedic Medical
11  Group, Inc., ("Sobol Orthopedic") located in Pasadena.  In 2005,
12  defendant and Drobot entered into an agreement under which Drobot,
13  through PSPM, would pay defendant $75,000 every month for the option
14  to buy the assets of Sobol Orthopedic.  In return, defendant
15  attempted to refer and often did refer his patients to Pacific
16  Hospital.  Specifically, defendant either performed surgeries on the
17  patients at Pacific Hospital himself, or - particularly in the case
18  of spine surgeries -referred them to other surgeons, with specific
19  instructions to those surgeons that they were to perform the
20  surgeries only at Pacific Hospital, if possible, as a condition of
21  receiving the referrals.  In 2008, the amount of the monthly payments
22  was adjusted upward to $100,000; in 2009, it was adjusted downward to
23  $60,000.  In total, PSPM paid defendant $2.18 million under this
24  arrangement.  In some cases, payments were made by CPM or IPM, rather
25  than PSPM; from June 2005 to June 2008, those payments totaled
26  approximately $2.1 million.

27    Also in 2005, defendant, on behalf of Sobol Orthopedic, and
28  Drobot, on behalf of IPM, entered into a "claims purchase agreement"

1   under which IPM would set up a mini-pharmacy in Sobol's office and

2   pay Sobol Orthopedic $70,000 per month to purchase all insurance

3   claims for medications dispensed through the pharmacy.   From 2005

4   until 2011, IPM paid Sobol Orthopedic that amount every month.   In

5   January 2011, the option agreement with PSPM was terminated.   In its

6   place, and in return for defendant's continued referral of patients

7   to Pacific Hospital, the claims purchase agreement with IPM was

8   amended to provide for a monthly payment of $130,000.   Of that

9   amount, $60,000 was meant to replace the $60,000 that was no longer

10  paid by PSPM for the referral of the surgeries.   IPM made those

11  payments from February 2011 through December 2012.   In total, from

12  January 2011 forward, IPM made payments to defendant of $960,000 in

13  return for the spinal surgery referrals to Pacific Hospital.

14       In March 2013, to continue and conceal the referral arrangement,

15  defendant and Drobot entered into another option agreement between

16  Sobol Orthopedic and PSPM.   That same month, under this arrangement,

17  PSPM paid defendant $80,000.

18       In furtherance of the conspiracy and to accomplish the objects

19  of the conspiracy, defendant and other co-conspirators committed

20  various overt acts within the Central District of California,

21  including but not limited to the following:

22  Overt Act No. 1

23       On or about June 1, 2005, defendant and Drobot entered into an

24  agreement under which Sobol Orthopedic gave PSPM an option to

25  purchase the assets of Sobol Orthopedic in return for a monthly

26  payment of $75,000.

27  //

28  //

Overt Act No. 2

In or about March 2006, defendant referred Patient A to Surgeon A for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 3

On or about April, 2007, CPM mailed to Sobol Orthopedic a check for $75,000.

Overt Act No. 4

On or about April 1, 2008, defendant and Drobot entered into an amendment to their 2005 option agreement under which the monthly payment was increased to $100,000.

Overt Act No. 5

In or about November 2008, defendant referred Patient B to Surgeon B for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 6

On or about December 2, 2008, PSPM mailed to Sobol Orthopedic a check for $100,000.

Overt Act No. 7

On or about January 1, 2009, defendant and Drobot entered into an amendment to their 2005 option agreement under which the monthly payment was reduced to $60,000.

Overt Act No. 8

In or about January 2010, defendant referred Patient C to Surgeon C for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 9

On or about January 20, 2010, PSPM mailed to Sobol Orthopedic two checks for a total of $60,000.

//

//

1    Overt Act No. 10

2        On or about January 1, 2011, defendant and Executive A entered

3    into an agreement under which Sobol Orthopedic gave IPM a right to

4    purchase the claims of Sobol Orthopedic for medications dispensed

5    through IPM in return for a monthly payment of $130,000.

6    Overt Act No. 11

7        In or about May 2012, defendant referred Patient D to Surgeon D

8    for spinal surgery to be performed at Pacific Hospital.

9    Overt Act No. 12

10        On or about May 24, 2012, IPM mailed to Sobol Orthopedic a check

11    for $140,000.

12    Overt Act No. 13

13        In or about February 2013, defendant referred patient E to

14    Surgeon E for spinal surgery to be performed at Pacific Hospital.

15        Overt Acts 3, 6, 9, and 12, which defendant aided, abetted,

16    counseled, encouraged, and caused to be performed, involved the use

17    of the mails in furtherance of unlawful activity, specifically

18    payment and receipt of kickbacks in violation of California Business

19    & Professions Code § 650, California Insurance Code § 750, and

20    California Labor Code § 3215.

21        These stipulated facts are not meant to indicate that defendant

22    provided any patients with substandard medical care or that any

23    treatment he provided or prescribed was not medically necessary.

24                                SENTENCING FACTORS

25        22.  Defendant understands that in determining defendant's

26    sentence the Court is required to calculate the applicable Sentencing

27    Guidelines range and to consider that range, possible departures

28    under the Sentencing Guidelines, and the other sentencing factors set

forth in 18 U.S.C. § 3553(a).   Defendant understands that the
Sentencing Guidelines are advisory only, that defendant cannot have
any expectation of receiving a sentence within the calculated
Sentencing Guidelines range, and that after considering the
Sentencing Guidelines and the other § 3553(a) factors, the Court will
be free to exercise its discretion to impose any sentence it finds
appropriate up to the maximum set by statute for the crimes of
conviction.

23.   Defendant and the USAO agree to the following applicable
Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | |
| Loss between $3.5M and $9.5M: | +18 | [U.S.S.G. § 2B1.1(b)(1)(L)] |
| More than 10 victims: | +2 | [U.S.S.G. § 2B1.1(b)(2)(B)] |
| Abuse of Trust: | +2 | [U.S.S.G. § 3B1.3] |
| Acceptance of Responsibility: | -3 | [U.S.S.G. § 3E1.1] |
| Total: | 25 | |

24.   The USAO will agree to a two-level downward adjustment for
acceptance of responsibility (and, if applicable, move for an
additional one-level downward adjustment under U.S.S.G. § 3E1.1(b))
only if the conditions set forth in paragraph 2 and 3 are met.
Subject to paragraph 8 above and paragraph 36 below, defendant and
the USAO agree not to seek, argue, or suggest in any way, either
orally or in writing, that any other specific offense
characteristics, adjustments, or departures relating to the offense
level be imposed.   Defendant agrees, however, that if, after signing

18

1  this agreement but prior to sentencing, defendant were to commit an
2  act, or the USAO were to discover a previously undiscovered act
3  committed by defendant prior to signing this agreement, which act, in
4  the judgment of the USAO, constituted obstruction of justice within
5  the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the
6  enhancement set forth in that section.

7      25.   Defendant understands that there is no agreement as to
8  defendant's criminal history or criminal history category.

9      26.   Defendant and the USAO reserve the right to argue for a
10  sentence outside the sentencing range established by the Sentencing
11  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
12  (a)(2), (a)(3), (a)(6), and (a)(7).

13                    WAIVER OF CONSTITUTIONAL RIGHTS

14      27.   Defendant understands that by pleading guilty, defendant
15  gives up the following rights:

16          a.   The right to persist in a plea of not guilty.

17          b.   The right to a speedy and public trial by jury.

18          c.   The right to be represented by counsel – and if
19  necessary have the court appoint counsel - at trial.  Defendant
20  understands, however, that, defendant retains the right to be
21  represented by counsel – and if necessary have the court appoint
22  counsel – at every other stage of the proceeding.

23          d.   The right to be presumed innocent and to have the
24  burden of proof placed on the government to prove defendant guilty
25  beyond a reasonable doubt.

26          e.   The right to confront and cross-examine witnesses
27  against defendant.

28

                                  19

1         f.   The right to testify and to present evidence in
2  opposition to the charges, including the right to compel the
3  attendance of witnesses to testify.

4         g.   The right not to be compelled to testify, and, if
5  defendant chose not to testify or present evidence, to have that
6  choice not be used against defendant.

7         h.   Any and all rights to pursue any affirmative defenses,
8  Fourth Amendment or Fifth Amendment claims, and other pretrial
9  motions that have been filed or could be filed.

10  <u>WAIVER OF APPEAL OF CONVICTION</u>

11     28.  Defendant understands that, with the exception of an appeal
12  based on a claim that defendant's guilty pleas were involuntary, by
13  pleading guilty defendant is waiving and giving up any right to
14  appeal defendant's convictions on the offenses to which defendant is
15  pleading guilty.

16  <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

17     29.  Defendant agrees that, provided the Court imposes a total
18  term of imprisonment on all counts of conviction of no more than the
19  low end of the Guidelines range corresponding to a total offense
20  level of 25 and the criminal history category determined by the
21  Court, defendant gives up the right to appeal all of the following:
22  (a) the procedures and calculations used to determine and impose any
23  portion of the sentence; (b) the term of imprisonment imposed by the
24  Court; (c) the fine imposed by the court, provided it is within the
25  statutory maximum; (d) the amount and terms of any restitution order,
26  provided it requires payment of no more than $5.2 million; (e) the
27  term of probation or supervised release imposed by the Court,
28  provided it is within the statutory maximum; and (f) any of the

1  following conditions of probation or supervised release imposed by
2  the Court: the conditions set forth in General Orders 318, 01-05,
3  and/or 05-02 of this Court; the drug testing conditions mandated by
4  18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use
5  conditions authorized by 18 U.S.C. § 3563(b)(7).

6      30.  The USAO agrees that, provided (a) all portions of the
7  sentence are at or below the statutory maximum specified above and
8  (b) the Court imposes a term of imprisonment of no less than the low
9  end of the Guidelines range corresponding to an offense level of 25
10 and the criminal history category determined by the Court, the USAO
11 gives up its right to appeal any portion of the sentence, with the
12 exception that the USAO reserves the right to appeal the following:
13 the amount of restitution ordered if that amount is less than $5.2
14 million.

15                 <u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

16     31.  Defendant agrees that if, after entering guilty pleas
17 pursuant to this agreement, defendant seeks to withdraw and succeeds
18 in withdrawing defendant's guilty pleas on any basis other than a
19 claim and finding that entry into this plea agreement was
20 involuntary, then (a) the USAO will be relieved of all of its
21 obligations under this agreement, including in particular its
22 obligations regarding the use of Cooperation Information; (b) in any
23 investigation, criminal prosecution, or civil, administrative, or
24 regulatory action, defendant agrees that any Cooperation Information
25 and any evidence derived from any Cooperation Information shall be
26 admissible against defendant, and defendant will not assert, and
27 hereby waives and gives up, any claim under the United States
28 Constitution, any statute, or any federal rule, that any Cooperation

                                   21

1   Information or any evidence derived from any Cooperation Information
2   should be suppressed or is inadmissible; and (c) should the USAO
3   choose to pursue any charge or any civil, administrative, or
4   regulatory action that was either dismissed or not filed as a result
5   of this agreement, then (i) any applicable statute of limitations
6   will be tolled between the date of defendant's signing of this
7   agreement and the filing commencing any such action; and
8   (ii) defendant waives and gives up all defenses based on the statute
9   of limitations, any claim of pre-indictment delay, or any speedy
10  trial claim with respect to any such action, except to the extent
11  that such defenses existed as of the date of defendant's signing this
12  agreement.

## EFFECTIVE DATE OF AGREEMENT

14      32.   This agreement is effective upon signature and execution of
15  all required certifications by defendant, defendant's counsel, and an
16  Assistant United States Attorney.

## BREACH OF AGREEMENT

18      33.   Defendant agrees that if defendant, at any time after the
19  signature of this agreement and execution of all required
20  certifications by defendant, defendant's counsel, and an Assistant
21  United States Attorney, knowingly violates or fails to perform any of
22  defendant's obligations under this agreement ("a breach"), the USAO
23  may declare this agreement breached.   For example, if defendant
24  knowingly, in an interview, before a grand jury, or at trial, falsely
25  accuses another person of criminal conduct or falsely minimizes
26  defendant's own role, or the role of another, in criminal conduct,
27  defendant will have breached this agreement.   All of defendant's
28  obligations are material, a single breach of this agreement is

sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crimes to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant

agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

34. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## COURT AND PROBATION OFFICE NOT PARTIES

35. Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

36.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, and (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

37.   Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## NO ADDITIONAL AGREEMENTS

38.   Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

25

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

39.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

EILEEN M. DECKER
United States Attorney


_____         11/20/15
JOSHUA M. ROBBINS                        _____
Assistant United States Attorney         Date


_____         11-20-15
PHILIP A. SOBOL                          _____
Defendant                                Date


_____         11/20/15
CHARLES L. KREINDLER                     _____
Attorney for Defendant                   Date
Philip A. Sobol

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____        11-20-15
PHILIP A. SOBOL                         Date
Defendant

27

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am PHILIP A. SOBOL's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____          11/20/15
CHARLES L. KREINDLER              _____
Attorney for Defendant            Date
PHILIP A. SOBOL

28

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 15- |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 374: Conspiracy; 18 U.S.C. § 1952(a)(3): Interstate Travel in Aid of Racketeering] |
| PHILIP A. SOBOL, | |
| Defendant. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 371]

A.    INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

1.    Healthsmart Pacific Inc., doing business as Pacific Hospital of Long Beach ("Pacific Hospital"), was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot").

EXHIBIT
A

2.      International Implants LLC ("I2") was a limited liability company owned and operated by Drobot that was located in Newport Beach, California.   I2 purchased implantable medical devices ("hardware") for use in spinal surgeries from original manufacturers and sold them to hospitals, particularly Pacific Hospital.

3.      Pacific Specialty Physician Management, Inc. ("PSPM") was a California corporation, owned and operated by Drobot, that was located in Newport Beach, California.

4.      Industrial Pharmacy Management LLC ("IPM") was a limited liability company, owned and operated by Drobot and Executive A.

5.      California Pharmacy Management LLC ("CPM") was a limited liability company, owned and operated by Drobot and Executive A.

6.      Sobol Orthopedic Medical Group, Inc. ("Sobol Orthopedic") was a California corporation, owned and operated by defendant PHILIP A. SOBOL, that was located in Pasadena, California.

7.      The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment.   Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees.   When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim.   Claims were submitted to and paid by the insurance carriers either by mail or electronically.   The CWCS was governed by various California laws and regulations.

8.    The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, which provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employees without any other coverage.

9.    California law, including, but not limited to, the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibited the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for medical services.

10.    The Federal Employees' Compensation Act ("FECA") provided benefits to civilian employees of the United States, including United States Postal Service employees, for medical expenses and wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee.  Benefits available to injured employees included rehabilitation, medical, surgical, hospital, pharmaceutical, and supplies for treatment of an injury. The Department of Labor ("DOL") - Office of Workers' Compensation Programs ("OWCP") was the governmental body responsible for administering the FECA.  When a federal employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment by mail or electronically to Affiliated Computer Services ("ACS"), located in London, Kentucky, which was contracted with the DOL to handle such claims.  Upon approval of the claim, ACS sent payment by mail or electronic funds

3

1 | transfer from the U.S. Treasury in Philadelphia, Pennsylvania, to the
2 | medical service provider.

3 |     11.  Federal law prohibited the offering, delivering,
4 | soliciting, or receiving of anything of value in return for referring
5 | a patient for medical services paid for by a federal health care
6 | benefit program.

7 | B.   OBJECTS OF THE CONSPIRACY

8 |     12.  Beginning in or around 2005 and continuing to in or around
9 | April 2013, in Orange and Los Angeles Counties, within the Central
10 | District of California, and elsewhere, defendant SOBOL, together with
11 | Drobot, Executive A, and other co-conspirators known and unknown to
12 | the United States Attorney, knowingly combined, conspired, and agreed
13 | to commit the following offenses against the United States:  Mail
14 | Fraud and Honest Services Mail Fraud, in violation of Title 18,
15 | United States Code, Sections 1341 and 1346; and Interstate Travel in
16 | Aid of a Racketeering Enterprise, in violation of Title 18, United
17 | States Code, Section 1952(a)(3).

18 | C.   MANNER AND MEANS OF THE CONSPIRACY

19 |     13.  The objects of the conspiracy were to be carried out, and
20 | were carried out, in the following ways, among others:

21 |        a.  Drobot, Executive A, and other co-conspirators offered
22 | to pay kickbacks to doctors, chiropractors, workers' compensation and
23 | personal injury attorneys, marketers, and others for referring
24 | workers' compensation patients to Pacific Hospital for spinal
25 | surgeries and other medical services, to be paid primarily through
26 | the CWCS and the FECA.  For spinal surgeries, typically, Drobot
27 | offered to pay a kickback of $15,000 per lumbar fusion surgery and

28 | 4

1   lower amount per cervical fusion surgery, provided that equipment

2   distributed through I2 was used in the surgery.

3         b.   Influenced by the promise of kickbacks, doctors,

4   chiropractors, workers' compensation and personal injury attorneys,

5   marketers, and others referred patients insured through the CWCS and

6   the FECA to Pacific Hospital for spinal surgeries, other types of

7   surgeries, and other medical services.  In some cases, doctors,

8   chiropractors, or others referred patients to spinal surgeons, with

9   instructions that the referrals were conditioned on the spinal

10  surgeons' performing the surgeries at Pacific Hospital.  The workers'

11  compensation patients were not informed that the medical

12  professionals had been offered kickbacks to induce them to refer the

13  surgeries and other medical services to Pacific Hospital.  That

14  information would have been material to those patients, to whom the

15  doctors owed a fiduciary duty to disclose any financial conflicts of

16  interest.

17        c.   The surgeries and other medical services were

18  performed on the referred workers' compensation patients at Pacific

19  Hospital.

20        d.   Pacific Hospital submitted claims, by mail and

21  electronically, to SCIF and other workers' compensation insurance

22  carriers for payment of the costs of the surgeries and other medical

23  services.

24        e.   As the co-conspirators knew and intended, and as was

25  reasonably foreseeable to them, in submitting claims for payment,

26  Pacific Hospital concealed material information from SCIF and other

27  workers' compensation insurance carriers, including the fact that

28                                    5

1  Pacific Hospital had offered or paid kickbacks for the referral of
2  the surgeries and other medical services for which it was submitting
3  claims.

4         f.    The insurance carriers paid Pacific Hospital's claims,
5  by mail or electronically.

6         g.    Drobot and other co-conspirators paid and caused
7  others to pay kickbacks to doctors, chiropractors, workers'
8  compensation and personal injury attorneys, marketers, and others who
9  had referred patients to Pacific Hospital for surgeries and other
10 medical services.

11        h.    To conceal the nature of the kickback payments from
12 both workers' compensation insurance carriers and patients, in 2005,
13 defendant SOBOL and Drobot entered into an agreement under which
14 Drobot, through PSPM, would pay defendant SOBOL $75,000 every month
15 for the option to buy the assets of Sobol Orthopedic.  In return,
16 defendant SOBOL attempted to refer and often did refer his patients
17 to Pacific Hospital.  Specifically, defendant SOBOL either performed
18 surgeries on the patients at Pacific Hospital himself, or -
19 particularly in the case of spine surgeries - referred them to other
20 surgeons, with specific instructions to those surgeons that they were
21 to perform the surgeries only at Pacific Hospital as a condition of
22 receiving the referrals.  In 2008, the amount of the monthly payments
23 was adjusted upward to $100,000; in 2009, it was adjusted downward to
24 $60,000.  In total, PSPM paid defendant SOBOL $2.18 million under
25 this arrangement.  In some cases, payments were made by CPM or IPM,
26 rather than PSPM; from June 2005 to June 2008, those payments totaled
27 approximately $2.1 million.

28                                    6

1          i.   Also in 2005, defendant SOBOL, on behalf of Sobol
2    Orthopedic, and Drobot, on behalf of IPM, entered into a "claims
3    purchase agreement" under which IPM would set up a mini-pharmacy in
4    defendant SOBOL's office and pay Sobol Orthopedic $70,000 per month
5    to purchase all insurance claims for medications dispensed through
6    the pharmacy.  From 2005 until 2011, IPM paid Sobol Orthopedic that
7    amount every month.  In January 2011, the option agreement with PSPM
8    was terminated.  In its place, and in return for defendant SOBOL's
9    continued referral of patients to Pacific Hospital, the claims
10   purchase agreement with IPM was amended to provide for a monthly
11   payment of $130,000.  Of that amount, $60,000 was meant to replace
12   the $60,000 that was no longer paid by PSPM for the referral of the
13   surgeries.  IPM made those payments from February 2011 through
14   December 2012.  In total, IPM made payments to defendant SOBOL of
15   $960,000 in return for the spinal surgery referrals to Pacific
16   Hospital.

17          j.   In March 2013, to continue and conceal the referral
18   arrangement, defendant SOBOL and Drobot entered into another option
19   agreement between Sobol Orthopedic and PSPM.  That same month, under
20   this arrangement, PSPM paid defendant SOBOL $80,000.
21   D.   EFFECTS OF THE CONSPIRACY
22        14.  Had SCIF and the other workers' compensation insurance
23   carriers known the true facts regarding the payment of kickbacks for
24   the referral of workers' compensation patients for surgeries and
25   other medical services performed at Pacific Hospital, they would not
26   have paid the claims or would have paid a lesser amount.
27
28                                   7

15. From 2005 to in or around April 2013, Pacific Hospital billed workers' compensation insurance carriers approximately $580 million in claims for spinal surgeries that were the result of the payment of a kickback; and Drobot and other co-conspirators paid kickback recipients between approximately $20 million and $50 million in kickbacks relating to those claims.

E.   OVERT ACTS

16. On or about the following dates, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant SOBOL and other co-conspirators known and unknown to the United States Attorney committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

Overt Act No. 1: On or about June 1, 2005, defendant SOBOL and Drobot entered into an agreement under which Sobol Orthopedic gave PSPM an option to purchase the assets of Sobol Orthopedic in return for a monthly payment of $75,000.

Overt Act No. 2: In or about March 2006, defendant SOBOL referred Patient A to Surgeon A for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 3: On or about April, 2007, CPM mailed to Sobol Orthopedic a check for $75,000.

Overt Act No. 4: On or about April 1, 2008, defendant SOBOL and Drobot entered into an amendment to their 2005 option agreement under which the monthly payment was increased to $100,000.

Overt Act No. 5: On or about November 24, 2008, defendant SOBOL referred Patient B to Surgeon B for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 6: On or about December 2, 2008, PSPM mailed to Sobol Orthopedic a check for $100,000.

Overt Act No. 7: On or about January 1, 2009, defendant SOBOL and Drobot entered into an amendment to their 2005 option agreement under which the monthly payment was reduced to $60,000.

Overt Act No. 8: In or about January 2010, defendant SOBOL referred Patient C to Surgeon C for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 9: On or about January 20, 2010, PSPM mailed to Sobol Orthopedic two checks for a total of $60,000.

Overt Act No. 10: On or about January 1, 2011, defendant SOBOL and Executive A entered into an agreement under which Sobol Orthopedic gave IPM a right to purchase the claims of Sobol Orthopedic for medications dispensed through IPM in return for a monthly payment of $130,000.

Overt Act No. 11: In or about May 8, 2012, defendant SOBOL referred Patient D to Surgeon D for spinal surgery to be performed at Pacific Hospital.

Overt Act No. 12: On or about May 24, 2012, IPM mailed to Sobol Orthopedic a check for $140,000.

Overt Act No. 13: In or about February 2013, defendant SOBOL referred patient E to Surgeon E for spinal surgery to be performed at Pacific Hospital.

9

17.   Overt Acts 3, 6, 9, and 12, which defendant SOBOL aided, abetted, counseled, encouraged, and caused to be performed, involved the use of the mails in furtherance of unlawful activity, specifically payment and receipt of kickbacks in violation of California Business & Professions Code § 650, California Insurance Code § 750, and California Labor Code § 3215.

10

1

## COUNT TWO

2

[18 U.S.C. §§ 1952(a)(3), 2(a)]

3      18.   Paragraphs one through thirty of this Information are re-
4   alleged and incorporated as if fully set forth herein.

5      19.   On or about the date set forth below, in Orange and Los
6   Angeles Counties, within the Central District of California, and
7   elsewhere, defendant SOBOL used and aided, abetted, and caused others
8   to use, the mail and facilities of interstate commerce as described
9   below, with the intent to promote, manage, establish, carry on, and
10  facilitate the promotion, management, establishment, and carrying on
11  of an unlawful activity, that is, kickbacks in violation of
12  California Business & Professions Code § 650, California Insurance
13  Code § 750, and California Labor Code § 3215:  On or about May 24,
14  2012, IPM mailed to Sobol Orthopedic a check for $140,000.

15     20.   After that mailing took place, defendant performed and
16  attempted to perform and caused the performance of an act to
17  distribute the proceeds of, to promote, manage, establish, and carry
18  on, and to facilitate the promotion, management, establishment, and
19  carrying on of such unlawful activity as follows:  In or about
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28

11